

# NUMBER 13-24-00005-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JUAN JOSE DELUNA,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                  Appellee.

## ON APPEAL FROM THE 332ND DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva
Memorandum Opinion by Chief Justice Contreras**

Appellant Juan Jose DeLuna was convicted of aggravated sexual assault of a child, a first-degree felony (Count 1); prohibited sexual conduct with an ancestor or descendant, a second-degree felony (Count 2); and indecency with a child by contact, a second-degree felony (Count 3). *See* TEX. PENAL CODE ANN. §§ 21.11, 22.021, 25.02. He

was sentenced to thirty years' imprisonment for Count 1 and seven years' imprisonment for each of the other two counts, with all three sentences ordered to run consecutively. On appeal, DeLuna argues (1) the evidence was insufficient to support conviction on Count 1, and (2) the jury charges were erroneous because they allowed for non-unanimous convictions. We affirm.

## I.  BACKGROUND

Count 1 of the indictment alleged that, on or about January 30, 2021, DeLuna "intentionally or knowingly cause[d] the penetration of the anus of" his daughter Olivia,[1] "a child who was then and there younger than 14 years of age, by a vibrator." *See id.* § 22.021(a)(1)(B)(i). Count 2 alleged that, on or about May 30, 2021, DeLuna "intentionally or knowingly engage[d] in deviate sexual intercourse" with Olivia "by placing his genitals in contact with [Olivia's] mouth." *See id.* § 25.02(a)(1), (b)(1). Count 3 alleged that, on or about December 30, 2020, DeLuna "engage[d] in sexual contact" with Olivia by "touching any part of [Olivia's] genitals." *See id.* § 21.11(c)(1).

At trial, Jennifer Gonzalez testified that she is Olivia's aunt, that her sister Esmeralda Gonzalez is Olivia's mother, and that Esmeralda was once married to DeLuna. According to Jennifer, Esmeralda and DeLuna separated in January of 2021, but DeLuna continued living in the family home until August, along with the couple's three children, including ten-year-old Olivia. On August 13, 2021, Olivia informed Jennifer that "her dad had done some inappropriate things to her." Olivia also told Jennifer that "she had seen

---

[1] To protect the identity of the complainant, we refer to her and her sister by pseudonyms. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. CODE CRIM. PROC. ANN. ch. 58, subch. C ("Confidentiality of Identifying Information of Sex Offense Victims").

[DeLuna] on top of her sister." According to Jennifer, Olivia reported that the "inappropriate things" involved sexual abuse, that they usually happened at night while her siblings were sleeping and her mother was at work, that the abuse started when she was nine years old, and that DeLuna told her "[t]o keep it a secret." Jennifer called Esmeralda and informed her about the outcry.

Esmeralda stated that, while she and DeLuna were separated but still living together in 2021, she would sleep on the sofa "and the girls would be in the room with him." She said: "Never in a million years did I think I'd be here." Esmeralda reported Olivia's outcry to police on August 17, 2021.[2] Later, Olivia attended therapy, and the therapist informed Esmeralda that Olivia was harming herself and had suicidal ideations.

On cross-examination, Esmeralda acknowledged that she had been unfaithful during her marriage to DeLuna. She agreed that she and DeLuna were going through a divorce at the time Olivia made her outcry, and that DeLuna was seeking "full custody of our kids" and child support. She recalled that, about a month before Olivia's outcry, Olivia walked in on her when she was crying, and Olivia remarked "this is all dad's fault"; in response, Esmeralda said she told Olivia not to worry and that everything would be okay.

---

[2] When asked why she waited a "couple of days" to contact police, Esmeralda stated:

I think I was hoping . . . [t]hat it wasn't true. Because I knew she was mad at him, and I just assumed it's because of the separation.

And I would ask her, [Olivia], this is a hundred percent true, and she is like, yeah. And I was just like, okay.

And I was like, I just want to make sure like know you're prepared because now, I was like, I am going to go report this. I go, you are going to be asked a lot of questions, and I just want to make sure you are okay.

And she is just like, okay, mom. And then she is such a tough little girl. She is—she said, I am ready. She's like, to make sure it doesn't happen anymore.

She agreed that the children knew, prior to the outcry, that their parents were going to divorce and "there was going to be times where the kids would be with me, there was going to be times where the kids would be with him."

On August 26, 2021, Olivia was taken to the Children's Advocacy Center (CAC) for a forensic interview by Eduardo Corona. Andres Soto, then a police officer with the Mercedes Police Department, testified that he observed the interview in person. Cassandra Cruz, a CAC interviewer, did not participate in the interview but reviewed a video recording of it prior to her testimony.[3] Both Soto and Cruz testified without objection that, during the interview, Olivia made outcries of sexual abuse and identified DeLuna as the perpetrator. Soto specified that one of the alleged acts of abuse occurred in January of 2021, when "the whole family tested positive for COVID." He further stated that one of the acts of abuse which Olivia alleged in the interview was DeLuna "plac[ing]" a "[p]urple vibrator" "in her anus."

The following exchange occurred during Cruz's testimony:

Q. [Prosecutor]     . . . . [D]id [Olivia] identify an object—

A. [Cruz]     Yes.

Q.     —that was used?

A.     Uh-huh.

Q.     What did she—what was that object?

A.     A vibrator.

Q.     Okay. How did she—how did she describe it?

___

[3] The video recording was not entered into evidence or played for the jury, and does not appear in the appellate record. Corona did not testify.

| A. | She described it as . . . she used a sound that it makes like a zoom zoom like when a car goes really fast. And after she made—I believe she mentioned about it vibrating. |
|---|---|
| Q. | Okay. Did she indicate a color— |
| A. | Purple. |
| Q. | —do you recall? What acts did she describe that you recall? |
| A. | From what I recall him putting it on her butt. |
| Q. | What's it? |
| A. | The vibrator. I'm sorry. With the vibrator or— |
| Q. | Yes. |
| A. | Okay. The putting it in her butt. |

CAC records were introduced into evidence without objection. The records included the following summary of the August 26, 2021 interview:

> Victim stated that her father had touched her part that goes pee with his part that goes pee. She stated that he[r] father took her to the living room where she laid on couch and her father put his part that goes pee inside her. Victim stated that it felt like slime and that her father told her they needed to hurry up so her mother would not see. She stated that this happened when her dad had "corona" as he asked her to make him feel better. Victim stated that her father used a purple vibrator on the outside of her butt. She stated that it didn't go inside but it did hurt when he tried. She stated her father also told her to suck his part that goes pee and she was going up and down with her mouth. Victim state[d] her father has taken a photo of her while she was sucking his part that goes pee. She stated that her father has put his part that goes pee inside her sister's part that goes pee as he has seen them both in the same position as she has been with their father when it happens to her.

Police arrested DeLuna. Ralph Rico, then an investigator with the Department of Family and Protective Services, testified that he interviewed DeLuna in jail, and DeLuna denied abusing Olivia. Instead, DeLuna said "he thought [Esmeralda] was cheating as

5

she spent a lot of hours out of the home and was coaching the children to say that they were being abused to get him exiled from the home."

Cynthia Gomez, a sexual assault nurse examiner, testified that she examined Olivia on September 28, 2021. She read verbatim from her records, which were entered into evidence without objection. The records stated:

Patient arrives to [CAC] accompanied by mother and sibling. I introduce myself to mother and patient and bring them to forensic waiting room. Child appears alert and oriented to time, person, place and situation. Child's behavior is appropriate for her age. Child agrees to examination and so does mother. Consents are obtained from mother and child is brought to exam room in private. Child enters exam room and sits on exam bed.

Can you tell me why you are here today, [Olivia]? Patient responds, "Well I'm here today because my mom she said we were not going to school today because we were going to this exam, and I was confused and I asked her questions and it was because if he was going farther and she just wanted to check on me. So, ummm the third or fourth day I told her ummm about what happened, and she said that there was gonna be a lot to go through and she also said that I was gonna have to go to the doctors and police investigating. I said okay, I guess this is why I am here, I guess this is what she meant to go to the doctor and check me. So, my dad has been doing strange things to me and I had enough of it cuz my mom and dad they were getting a divorce and so he stopped doing it and then I told mom what happened because he told me to keep our secret. It probably happened when I was seven or eight and also nine."

What happened? Patient responds, "He told me that it was something of how adults like make babies, I didn't understand why he was doing it cuz I was only little so. The same thing how people do it to make babies, like told me to do stuff I didn't really know so I just did it. I showed my whole body, he put something in; like where I fart (points to anus), I didn't know what that something was; I don't know what it was."

What did you mean by he put something in? "Something where his legs were." Can you point to that part? "I don't know, I remembered right now that it was the slimy thing (points to female sexual organ area)." Tell me more. "So, this has been happening for a lot of times and then when he just kept doing it and so my mom were getting close to a divorce and he felt very sad and I did, I had these feelings, every time this has been happening. And every time I try telling my mom he's been defending himself. So then, one

6

time when I told my mom this was in a call cuz she was at work, my sisters and brothers were getting annoying. I got my phone and I called mom and I told her what happened and then my dad and then she said okay I'm gonna call your dad and talk to him. After that my dad came to the room and was defending himself and then I said oh it was just a joke because my dad gave me a speech to stop telling my mom, and said I'd be in jail and I said okay okay, and I really loved him at that time.

["]The second time, I was getting ready for school, when we were getting ready to school, he also did it to my sister [Sophia] so then me and her we woke up and we decided to talk to each other, and we said we had enough. We tried telling mom whenever she woke up and then we said no, no no we were just kidding, and we went to school. Can I tell you what he's been trying to hide from me?" Yes, go ahead [Olivia]. "So, every time whenever he's like come here [Sophia] every time I check the living room ummm he's just there laying down and [Sophia]'s there too and I'm really sure that he's also doing it to [Sophia] and I had to clarify with [Sophia] if he's doing it to her too and she said yes. And then, so I know he was doing it to my sister, we had a talk so when my mom had the divorce, I don't know why but he stopped doing it.

["]I also wanna say this might be a little off topic one time on my phone I had this virus and it showed different people doing things to other people, when my dad saw the virus, he knew he was gonna get in trouble; I thought he was, but he never did. I got grounded. So then one time, at my house my dad did the same thing, when I would show my body and he put something in where I fart, I really did not exactly know but the only thing I remember is that it felt sticky, the thing he was putting in my where I fa[r]t (points to anus). To my sister, he was laying down, but it was different usually I am flat, and he put it in the sticky thing in my where I fart, but it was different when I came out, I couldn't really see cuz my head was in a pillow but my sister were in a different position. My sister was next to him, I couldn't see, and my dad was just laying down like face forward, he told me to go and that's all I remember."

When was this? Patient responds, "This was a very long time ago when I was six or seven." What is your dad's name? ["]Juan Martin de Luna [sic]." When was the first time he did something to you? "When I was four or five. So, he's been doing this a long time." Tell me about the first time he did something to you. "Ummm the first first time was actually when I was threeish like four kind of ummm so then I think this is what I think, I think []he had an idea to do and he did probably didn't wanna do this cuz I was a kid and didn't wanna kill me. When I was four or five, he started doing it cuz I was older. The first time, he put me in front laying down and him on me and he went up and down like on me up and down that's all I remember cuz

7

it's been a long time ago."

When was the last time something happened? "The last time when my dad had the divorce with mom, it was at I don't remember, I do remember I was nine at that time. He my mom and my dad thought my dad was doing nothing cuz usually when my mom's at work; my mom thinks they were arguing that he was having bad decisions. He said she's the one making bad decisions. There was more, my mom came in the room my dad had to go to court to leave the house and go to his mom[']s and stay and whenever I told my mom what he was doing to me, I was scared to tell my mom first. I told my Tia that what he was doing to me." Patient does not further describe.

How often was this happening [Olivia]? "This was happening for a long time, for a very long time." Besides what you told me is there anything else that he did to you? Patient responds, "No, I don't remember anything else. He did one time he said to do something to him, it was like you know what I told you about that slimy thing he told me to do what people do to popsicles like they suck it, right when mom came home, she told us to go back to my room and act normal." Who told you that? "My dad." He told you to suck what? "The slimy thing." What is the slimy thing? "It was like here (points to female sexual organ area). That's all I can remember."

Is there anything else you'd like to tell me? Patient states, "He tried putting the slimy part in, but he said it wouldn't fit in where I pee (points to female sexual organ). It felt slimy." Tell me more. Patient does not describe further. Anything else? Patient responds, "No."

No physical evidence of abuse or trauma was recovered from the examination.

Olivia, who was twelve years old at the time of trial, testified as follows:

Q. [Prosecutor]    What happened with your dad?

A. [Olivia]    Let's see.

Q.    How old were you when the first time it happened?

A.    I am unsure, but I am thinking at least six, something like that.

Q.    What happened when you were six years old?

A.    He would make—make me do things that shouldn't really be allowed for kids like that age.

8

Q.       Okay. What type of things?

A.       Like touch me, or like—

Q.       Where would he touch you?

A.       My body.

Q.       Okay. You want to be a little more descriptive?

A.       Mostly upper or lower.

Q.       Okay. When you are saying upper, what do you mean by upper?

A.       Like here. (Indicating.)

Q.       Are you pointing to your chest area?

A.       Yes.

Q.       And you say lower. Where—where lower?

A.       Near my legs.

Q.       Near your legs. Is that a private part that he is touching you?

A.       Yes, I'd say.

Q.       Okay. What is that private part used for?

A.       I am unsure.

Q.       Do you go to the restroom with that private part?

A.       Yeah.

Q.       What comes out of that private part?

A.       Pee.

Q.       Pee. Okay. And he would touch that?

A.       Yeah.

Q.       With what?

9

A.      Like when I said a vibrator.

Q.      Okay. What else would he touch you with?

A.      Nothing else, I don't think.

Q.      Any other part—you said also bottom. Any other part
of their bottom?

A.      (Moving head side to side.)

Q.      And you said vibrator. What's a vibrator?

A.      Something that moves a lot.

Q.      Moves a lot. Okay. How do you—how did you come up
with the word vibrator?

A.      Because it just—it like vibrates.

Q.      Okay. Is there a specific color?

A.      Yeah, purple was what I saw.

Esmeralda had previously testified that she purchased a "small purple vibrator" while she was married to DeLuna, that she kept it in a drawer, and that DeLuna knew where it was located. Police recovered a small purple and black device from the residence, and a photo of it was entered into evidence at trial. Olivia testified: "That's the vibrator I was talking about."

Olivia also testified that DeLuna "put something in" her "butt" when she was younger than ten years old. She said the thing was "hairy" and was "on him" but was not the vibrator. She said this happened around five times, that it happened on "the couch and the parent room" in the family residence, and that "[t]he thing he put in my butt he would also put in my mouth." She also testified that, one time, DeLuna showed her a video of people without clothes on doing something "weird," and he told her to "replicate

10

it." Olivia agreed that the people in the video were doing the same thing that DeLuna had done to her. On cross-examination, she denied that the abuse occurred when she and her family acquired COVID in early 2021.

Olivia's younger sister Sophia, nine years old at the time of trial, testified that DeLuna "put his middle part in mine" when she was around six years old. She said this happened "[m]ore than ten" times and that it always happened in her mother's room. She said she did not tell her mother about what happened because she was scared that her mother "would yell at us."

DeLuna testified on his own behalf and denied all the accusations of sexual abuse. He stated that he worked odd jobs and did not have a driver's license or a vehicle, but he would walk the children to school and pick them up most days. He said he did most of the cooking and cleaning in the household until he left in January 2021.

The jury found DeLuna guilty of all three charged offenses, and he was sentenced as set forth above. This appeal followed.

## II.    EVIDENTIARY SUFFICIENCY

By his first issue, DeLuna argues the evidence was insufficient to support his conviction for aggravated sexual assault with a child as alleged in Count 1.

## A.    Standard of Review and Applicable Law

To satisfy constitutional due process requirements, a criminal conviction must be supported by sufficient evidence. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). "Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*,

11

602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In a sufficiency review, we view the evidence in the light most favorable to the verdict and consider all of the admitted evidence. *Id.* We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence and are not mere speculation. *See id.*; *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses"; therefore, "[w]hen the jury could reasonably draw conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict." *Stahmann*, 602 S.W.3d at 577; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (citing *Malik*, 953 S.W.2d at 240). "The law 'authorized by the indictment' consists of the statutory elements of the offense as modified by the indictment allegations." *Id.*

A hypothetically correct jury charge would instruct the jury to return a guilty verdict on Count 1 if the evidence established beyond a reasonable doubt that DeLuna, on or about January 30, 2021, (1) intentionally or knowingly (2) caused the penetration of

12

Olivia's anus, (3) and Olivia was then younger than fourteen years of age. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(2)(B). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Intent may generally be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). And a victim's testimony alone can support a conviction for child sexual abuse. TEX. CODE CRIM. PROC. ANN. art. 38.07.

## B.    Analysis

DeLuna argues that "no rational trier of fact could have found beyond a reasonable doubt that [he] penetrated [Olivia's] anus with a vibrator." He notes that, at trial, Olivia testified only that DeLuna "touch[ed]" her with a purple vibrator on her "private part" from which she "[p]ee[s]." The State replies by pointing to testimony from Cruz that Olivia alleged in her CAC interview that DeLuna was "putting [the vibrator] in her butt." We observe that Cruz was not the forensic interviewer in this case but rather read from CAC records which were prepared by the actual interviewer, Corona. And according to Corona's records, Olivia stated that DeLuna "used a purple vibrator on the outside of her butt" and "it didn't go inside." This evidence arguably does not support a finding of penetration. *See Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992) (noting that, in the context of the aggravated sexual assault statute, "'penetrate' may mean 'to enter into' or 'to pass through' . . .   Thus, in common parlance, mere contact with the

13

outside of an object does not amount to a penetration of it.").

Nevertheless, Soto testified that he personally observed that Olivia alleged at the interview, among other things, that DeLuna "plac[ed]" a "[p]urple vibrator" "in her anus." DeLuna complains that Soto "was a mere bystander and not a proper outcry witness nor medical provider." However, no objection was made to the testimony on any grounds. *See* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay.").

In any event, we do not find that the State was required to prove that DeLuna's penetration of Olivia's anus was accomplished "by a vibrator," even though that allegation was included in Count 1 of the indictment. "When a statute lays out several alternative methods of committing the offense, and the indictment alleges only one of those methods, 'the law as authorized by the indictment' is limited to the method specified in the indictment." *Geick v. State*, 349 S.W.3d 542, 545 (Tex. Crim. App. 2011). But "when an indictment needlessly pleads an allegation that gives rise to an immaterial variance, that allegation will not be included in the hypothetically correct jury charge." *Id.*

When reviewing a variance for materiality, we must determine "whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under the deficiently drafted indictment would subject the defendant to the risk of being prosecuted later for the same crime." *Gollihar v. State*, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001). A variance involving "a statutory allegation that defines the offense" is always material. *Ramjattansingh v. State*, 548 S.W.3d 540, 547 (Tex. Crim. App. 2018). On the other hand,

14

a variance involving "a non-statutory allegation that is descriptive of an element of the offense that defines or helps define the allowable unit of prosecution" is material "only when it converts the offense proven at trial into a different offense than what was pled in the charging instrument, which could potentially subject a defendant to another prosecution for the same offense." *Hernandez v. State*, 556 S.W.3d 308, 316 (Tex. Crim. App. 2017). A variance involving "a non-statutory allegation that has nothing to do with the allowable unit of prosecution" is never material. *Ramjattansingh*, 548 S.W.3d at 547.

Under the penal code, "caus[ing] the penetration of the anus or sexual organ of a child by any means" is one of several alternative methods of committing aggravated sexual assault. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i); *see also id.* § 22.021(a)(1)(A)(i)–(iii), (B)(ii)–(v). Therefore, to obtain a conviction on Count 1, the State was required to show that DeLuna caused the penetration of Olivia's anus. *See Johnson*, 364 S.W.3d at 294. But the specific method by which that penetration was caused is not a statutory element of the offense. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i). Moreover, the allowable unit of prosecution for aggravated sexual assault is penetration. *Hernandez v. State*, 631 S.W.3d 120, 124 (Tex. Crim. App. 2021). Therefore, the allegation in the indictment regarding the means by which DeLuna penetrated Olivia's anus was not "descriptive of an element of the offense that defines or helps define the allowable unit of prosecution." *See Ramjattansingh*, 548 S.W.3d at 547; *see also Jourdan v. State*, 428 S.W.3d 86, 96 (Tex. Crim. App. 2014) (noting that "the gravamen of [§ 22.021(a)(1)(A)(i)] is penetration, not the various and unspecified 'means' by which that penetration may be perpetrated, which are not elemental" and holding that "the

15

penetration of a single orifice (the sexual organ) of the one victim (Kemp) during the same transaction constituted but one offense under [§] 22.021(a)(1)(A)(i), regardless of the various manner and means by which the evidence may show that the penetration occurred"). The variance was not material because it does not "potentially subject [DeLuna] to another prosecution for the same offense." *See Hernandez*, 556 S.W.3d at 316; *Jourdan*, 428 S.W.3d at 96. And importantly, there is no suggestion that the indictment failed to allow DeLuna to prepare an adequate defense at trial. *See Gollihar*, 46 S.W.3d at 257.

It is undisputed that the evidence in this case supported a finding that DeLuna caused the penetration of Olivia's anus by a method other than that specifically alleged in the indictment.[4] The evidence is therefore sufficient to sustain conviction on Count 1. DeLuna's first issue is overruled.

### III.    JURY UNANIMITY

By his second issue, DeLuna contends the jury charge erroneously allowed the jury to reach a non-unanimous verdict as to all three counts, and that this error caused him to suffer egregious harm. He argues with respect to each count that "the jury may have heard multiple vague potential acts, time frames, and locations [upon] which to convict but was not instructed that it must unanimously agree upon a single and discrete

---

[4] In particular, according to Gomez's records, Olivia stated DeLuna put a "slimy thing (points to female sexual organ area)" "in . . . where I fart (points to anus)," and another time, he put a "sticky" thing "in where I fa[r]t (points to anus)." And Olivia testified at trial that DeLuna put something that was "hairy" and "on him" "in [her] butt" when she was younger than ten years old. We note that "[c]ourts give wide latitude to testimony given by child victims of sexual abuse." *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (citing *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990)). "The victim's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult." *Id.*

16

incident that would constitute the commission of the offense alleged in order to convict."

## A.    Standard of Review and Applicable Law

After a jury trial in a felony case, the trial court is required to submit to the jury a "written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." TEX. CODE CRIM. PROC. ANN. art. 36.14. We review alleged jury charge error for abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000). A trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004).

Texas law requires that a jury reach a unanimous verdict about "the specific crime that the defendant committed." *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011) (citing *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008)). "This means that the jury must 'agree upon a single and discrete incident that would constitute the commission of the offense alleged.'" *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 717 (Tex. Crim. App. 2007)). A non-unanimity issue may arise "when the State charges one offense and presents evidence that the defendant committed the charged offense on multiple but separate occasions." *Id.* at 771–72. In that situation, a defendant may choose to require the State to elect a specific criminal act that it relies upon for conviction, though this is a strategic choice that may be waived or forfeited. *Smith v. State*, 515 S.W.3d 423, 428–29 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (observing that "[o]ne reason that a defendant may decide against demanding an election is that the State will be

17

jeopardy-barred from prosecuting the other offenses that were in evidence"). "Even if the defendant does not require an election, the trial judge bears the ultimate responsibility to ensure unanimity through the instructions in the jury charge." *Id.* at 429 (citing *Cosio*, 353 S.W.3d at 776).

## B.     Analysis

The jury charges in this case instructed that "[y]our verdict must be unanimous, and after you have reached a unanimous verdict, the Presiding Juror will certify thereto by signing the appropriate form attached to this charge." The charges contained no other instruction regarding jury unanimity, and none was requested. The State concedes that the instructions were "flawed" because, even though there was evidence of multiple instances of abuse,[5] the charge did "not instruct the jury that . . . their verdict must be unanimous as to which alleged event was proved beyond a reasonable doubt." *See id.*

We assume but do not decide that the trial court erred by failing to include a more comprehensive instruction on unanimity in the jury charges. When jury charge error is not preserved at trial, as here, it requires reversal only if appellant suffered "egregious harm" as a result of the error. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) (citing *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984)). "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). A finding of egregious harm must be based on "actual harm

---

[5] The State argues that there was evidence of only one act as alleged in Count 1, but it admits there was evidence of multiple acts as alleged in Counts 2 and 3 on separate occasions.

18

rather than theoretical harm." *Id.* In reviewing for egregious harm, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

We find this case analogous to *Cosio*. We agree with DeLuna that, as in *Cosio*, there was evidence of multiple instances of abuse as alleged in each of the three counts. In particular as to Count 1, Olivia told Gomez of at least two discrete instances in which DeLuna caused the penetration of her anus, and she testified at trial that he "put something in" her "butt" around five times on "the couch and the parent room." As to Count 2, the evidence included: (1) Olivia's statement, as recounted in the CAC records, that DeLuna "told her to suck his part that goes pee"; (2) her statement, as recounted in Gomez's records, that DeLuna told her to "suck" a "slimy thing . . . here (points to female sexual organ area)"; and (3) her testimony that "[t]he thing he put in my butt he would also put in my mouth." As to Count 3, according to the CAC records, Olivia stated that DeLuna "touched her part that goes pee with his part that goes pee"; she then testified at trial that DeLuna touched her vagina with "a vibrator."

That said, as in *Cosio*, "neither of the parties nor the trial judge added to the charge errors by telling the jury that it did not have to be unanimous about the specific instance of criminal conduct in rendering its verdicts." 353 S.W.3d at 777. Moreover, also as in *Cosio*, DeLuna's "defense was that he did not commit any of the offenses and that there was reasonable doubt as to each of the . . . incidents" because Olivia "was not credible and the practical circumstances surrounding the incidents of criminal conduct did not

19

corroborate [her] testimony." *Id.* "His defense was essentially of the same character and strength across the board." *Id.* "The jury was not persuaded that he did not commit the offenses or that there was any reasonable doubt. Had the jury believed otherwise, they would have acquitted [him] on all counts." *Id.* at 777–78. "On this record, therefore, it is logical to suppose that the jury unanimously agreed that [he] committed all of the separate instances of criminal conduct during each of the . . . incidents. It is thus highly likely that the jury's verdicts . . . were, in fact, unanimous." *Id.* (finding no egregious harm even though the jury charges "permitted non-unanimous verdicts based on the evidence presented in the case").

Considering the factors set forth in *Almanza* and applied in *Cosio*, we conclude DeLuna did not suffer actual, egregious harm from the lack of an appropriate unanimity instruction in the jury charges. We overrule DeLuna's second issue.

## IV. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS<br>
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
31st day of October, 2024.

20